**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 25-190 |
| | ) | Judge Nora Barry Fischer |
| EDWARD ARTHUR OWENS, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

I.      INTRODUCTION

On January 12, 2026, Defendant Edward Arthur Owens, Jr. pled guilty to one count of interstate threats, in violation of 18 U.S.C. § 875(c), for conduct occurring on or about May 20, 2025, and one count of false statements to a government agent, in violation of 18 U.S.C. § 100l(a)(2), for conduct occurring on or about May 30, 2025, at Counts One and Two of the Indictment at Criminal No. 25-190.

The U.S. Probation Office prepared a Presentence Investigation Report ("PIR") dated March 13, 2026. (Docket No. 48). Pursuant to the Local Criminal Rules, counsel for the Government and for Defendant each had an opportunity to submit objections to the PIR.  On March 19, 2026, Defendant filed his Position With Respect to Sentencing Factors, indicating that he has no objections, requests for modifications or changes to the PIR.  (Docket No. 50).  The Government filed its Position With Respect to Sentencing Factors that same day, wherein it lodged an objection to the Probation Office's exclusion of a six-level enhancement to the offense level computation at Count One under Guideline § 2A6.1(b)(1) for "conduct evidencing an intent to carry out such threat."   (Docket No. 49).

1

Thereafter, the Probation Office filed an Addendum dated March 26, 2026, noting the lack of objections from Defendant and addressing the Government's objection.   (Docket No. 53).   The Probation Office disagreed with the Government that the six-level enhancement under Guideline § 2A6.1(b)(1) should apply here and further recommended that the PIR remain unchanged.   (*Id.*). The Court ordered further briefing from the parties and has received Defendant's arguments in his Sentencing Memorandum dated April 6, 2026 and the Government's Response filed on April 13, 2026.   (Docket Nos. 54, 56, 57).   After careful consideration of the parties' arguments, and for the following reasons, the Court tentatively finds that the Government has met its burden to demonstrate by a preponderance of the evidence that the enhancement applies given all of the facts and circumstances in this case.

II.    BACKGROUND

The offense at Count One arose from Defendant's conduct on May 20, 2025.   At that time, Defendant was working at Miller's Motor Sports in Rostraver, Pennsylvania and living with his then-girlfriend in Elizabeth, Pennsylvania, both of which are located southeast of the City of Pittsburgh.   (PIR ¶¶ 23, 88, 75).   His mother lived with his stepfather north of the City of Pittsburgh in Harmony, Pennsylvania in Butler County.   (*Id.* ¶ 75).   He drove a vehicle that was registered in his mother's name.   (*Id.* ¶ 35).   He had a concealed weapons permit from Butler County and owned three firearms and associated ammunition, including a .22 caliber long rifle, an AR-15 style assault rifle, and a 9mm Smith & Wesson pistol.   (*Id.* ¶¶ 22, 35).   He had no prior criminal history at the time but had expressed antisemitic views to his girlfriend and friends via text messages and in social media posts.   (*Id.* ¶¶ 23–30).   For example, ten days before committing the offense at Count One, Defendant texted a friend that "The US should've fought

with Germany in ww2. We fucked up letting them Jews and communists have their way," and "Look at what the Jews are doing to the world."  (*Id.* ¶ 24).  The next day, he texted "Heil Hitler" to another individual.  (*Id.*).  Defendant also maintained a Facebook account with a fake name, "Casey Jones," which he used to post antisemitic content on that platform.  (*Id.* ¶ 18).

Returning to the events in question, at 6:57 p.m. on May 20, 2025, Defendant texted a friend, "You ready to hunt down Jews for extermination?"  (*Id.* ¶ 25).  The friend did not respond. (*Id.*).  Then, at 7:21 p.m., he searched "Pittsburgh jews" on Facebook.  (*Id.*).  Two minutes later, at 7:23 p.m., Defendant sent the threat charged at Count One to a local public official's personal Facebook Messenger account from his "Casey Jones" Facebook profile, which stated: "We're coming for you [emoji of person raising right hand] [German flag emoji] be afraid. Go back to Israel or better yet, exterminate yourself and save us the trouble. 109 countries for a reason.[1] We will not stop until your kind is nonexistent[.]"  (*Id.* ¶¶ 15–18).

At 8:11 p.m., Defendant took screenshots of multiple fake Talmud passages from the internet, including:

 

(*Id.* ¶ 26).  Between 8:15 p.m. and 8:22 p.m., Defendant sent a string of messages to another

---

1 The reference to "109 countries" is an antisemitic claim that Jews have been expelled from 109 countries, which antisemites use to support a call to expel Jews from other countries and otherwise spread hatred towards them.  (PIR ¶ 20).

3

friend, including:

> So you may not like what I'm about to say but I am 100% against Israel in every aspect. I've been watching the violence unfold in both Ukraine and the West Bank and I really don't see a difference between Israel tactics and Russians. They're (Jews) animals man. Killing everything and everyone in their way. It's just barbarism and I have zero support for any of it. Fuck everyone and everything involved in the Middle East conflicts

(*Id.* ¶ 27).   In the interim, at 8:19 p.m., he searched for "nyc synagogue" on the internet.   (*Id.* ¶ 28).

The victim read Defendant's message on May 22, 2025 and believed it was a threat to injure them and other people who are, or perceived to be, Jewish.   (*Id.* ¶¶ 17, 19).   The view of the message from the victim's Facebook Messenger account provides options to reply, block the user, or delete the message and states "If you reply, Casey Jones will be able to call you and see info like your Active Status and when you've read messages."   (*Id.* ¶ 18).   The victim reported the matter to authorities and did not reply.   (*Id.* ¶¶ 18–22).   The same day the victim read the message, Defendant commented words to the effect of "Jews have no place in America, go back to Israel" on another person's Facebook post.   (*Id.* ¶ 29).

Thereafter, on May 25, 2025, Defendant searched for "dancing Israelis" on the internet, which is a false conspiracy claim that Jews were responsible for the September 11 terrorist attacks. (*Id.* ¶ 30).   Later that same day, agents from the Federal Bureau of Investigation ("FBI") interviewed Defendant outside the Ramen Bar restaurant located at 5860 Forbes Avenue in the Squirrel Hill neighborhood of Pittsburgh.   (*Id.* ¶ 22).   The agents seized Defendant's cellphone pursuant to a search warrant and conducted a voluntary interview.   (*Id.*).   Defendant initially denied that he sent the threat or that he harbored any biases or ill will against any groups of persons, but he eventually admitted that he had sent the message.   (*Id.*).   He also told the investigators that he had a Pennsylvania concealed carry weapons permit, but he claimed that he did not have any

weapons at his residence.  (*Id.*).   His possession of firearms and access thereto was material to the investigation, in part, because it helped the agents assess Defendant's risk of harm to the victim, himself, and others.   (*Id.*).

The FBI agents also interviewed Defendant's girlfriend who had lived with him at her residence for over a year at that point.   (*Id.* ¶¶ 23).   She confirmed that Defendant had antisemitic views; she recalled that he had made antisemitic comments since the beginning of their relationship in 2023, but such comments were becoming increasingly frequent.   (*Id.*).   Defendant maintains that after his girlfriend spoke with the FBI, she asked him to move out of her apartment and he "found himself on the street" and "living out of his car."   (Docket No. 56 at 7, 17).   The relationship ended prior to Defendant's arrest for the instant offenses a few days later.   (*Id.* at 22).

On the evening of May 29, 2025, the Government initiated this action by filing a criminal complaint with a supporting affidavit from Special Agent Abigail Patcher charging Defendant with one count of transmitting a threat in interstate commerce and a corresponding motion for an arrest warrant.   (Docket Nos. 1–3).   The criminal complaint was sworn the next morning at a telephone hearing before Magistrate Judge Patricia L. Dodge and a warrant was issued for Defendant's arrest at 8:56 a.m. on May 30, 2025.   (Docket Nos. 4–7).   The docket reflects that the Government submitted a motion to unseal the case at 10:17 a.m. indicating that Defendant had been arrested and was in custody.   (Docket Nos. 8–9).

It is uncontested that Defendant was arrested that morning at the FBI field office located in the Southside neighborhood of the City of Pittsburgh.   (PIR ¶ 31).   The Government maintains that Defendant arrived at the FBI's office that morning "under the pretense of retrieving his cell phone" and he "was not aware that he was going to be arrested."   (Docket No. 49 at 6 n.2).

5

Defendant voluntarily waived his *Miranda* rights and participated in a recorded interview, during which he admitted that he sent the threat and stated that he has "issues with what's going on overseas." (PIR ¶ 32). He identified the victim because he believed that they supported Israel and assumed they were Jewish, and he specifically stated that he understood his language would put the victim in fear. (*Id.*).

The FBI agents inquired about whether Defendant possessed or had access to any firearms, and he advised that the three firearms he owned were locked up at his mother's house in Harmony and, when asked whether he could access them if he wanted to, he shook his head and stated, "Not right now, no." (*Id.* ¶¶ 33, 75). He further explained that he did not know where these guns were located and confirmed that his three firearms were the only weapons that he would historically have access to. (*Id.*). The agents subsequently contacted Defendant's mother who confirmed that she had the .22 caliber rifle and AR-15 assault rifle, but denied having possession of his 9mm pistol. (*Id.* ¶ 34).

Defendant's mother explained that he gave her his two rifles—but not his pistol—on May 25, 2025, after the FBI agents seized his phone. (*Id.* ¶ 35). She then provided the agents with written consent to search the vehicle Defendant drove to the FBI field office earlier that day prior to his arrest. (*Id.*). He was the sole occupant of the vehicle. (*Id.*). The subsequent search of the vehicle revealed a loaded and chambered Smith & Wesson M&P 9 Shield 9mm caliber semi-automatic pistol in the front pocket of a backpack on the passenger seat, and a bag located behind the front seat of the vehicle containing ammunition of various calibers, including approximately 265 rounds of 9mm caliber ammunition. (*Id.* ¶ 36). The backpack also contained Defendant's iPad and clothes, and his black iPhone was also recovered from inside the vehicle. (*Id.*).

Defendant's responses during the recorded interview concerning the location of his firearms and his access thereto, and the subsequent discovery of a 9mm pistol and various ammunition in his vehicle, is the underlying offense conduct for Count Two.

III.    LEGAL STANDARD

It is the Government's burden to demonstrate the applicability of a sentencing enhancement by a preponderance of the evidence.   *See United States v. Payo*, 135 F. 4th 99, 106 (3d Cir. 2025) (quoting *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014)).   The resolution of factual disputes is likewise governed by the preponderance of the evidence standard.   *See United States v. Fisher*, 502 F.3d 293, 304-05 (3d Cir. 2007); *see also* U.S.S.G § 6A1.3 cmt. ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of guidelines to the facts of a case."). Further, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."   U.S.S.G. § 6A1.3(a).   Any facts that are not disputed by the parties may be adopted by the Court as findings of fact.   *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact.").

Before the Court may consider the commentary to the Sentencing Guidelines, it must apply the three-step framework set forth in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc).

> First, we ask whether a Guideline provision is "genuinely ambiguous" by "carefully consider[ing] the [Guideline's] text, structure, history, and purpose." *Id.* at 471 (quoting *Kisor v. Wilkie*, —— U.S. ——, 139 S. Ct. 2400, 2415, 204 L.Ed.2d 841 (2019)). If the Guideline itself is unambiguous, our inquiry is at an end, and we

simply disregard the commentary. *Id.* If the Guideline is instead ambiguous, we proceed to step two and consider whether the corresponding commentary is "reasonable," i.e., within "the outer bounds of permissible interpretation," *id.*, but we "accord the commentary no weight" when it "expands the definition" of a term within the text of the Guidelines, *United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). At the third step, if the commentary reasonably interprets an ambiguous provision, we ask "whether the character and context of the agency interpretation entitles it to controlling weight." *Nasir*, 17 F.4th at 471. In other words, we afford that interpretation so-called Auer deference only if it "implicate[s] [the Commission's] substantive expertise" and "reflect[s] fair and considered judgment." *Id.* (citations omitted).

*United States v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023).

IV.     DISCUSSION

Sentencing Guideline § 2A6.1(b)(1) provides for a six-level enhancement "[i]f the offense involved any conduct evidencing an intent to carry out such threat."  U.S.S.G. § 2A6.1(b)(1). The commentary notes further explain that, when deciding whether the enhancement applies, "the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole."  *Id.* at cmt. n.1. For the six-level enhancement to apply, the U.S. Court of Appeals for the Third Circuit requires the defendant to have engaged in an overt act.  *United States v. Brodie*, 824 F.App'x. 117, 121 (3d Cir. 2020) (unpublished) (citing *United States v. Green*, 25 F.3d 206, 211 (3d Cir. 1994)).

The Government objects to the Probation Office's exclusion of any specific offense characteristics at ¶ 43 of the PIR, arguing that the six-level enhancement under U.S.S.G. § 2A6.1(b)(1) applies because Defendant's interstate threat involved conduct evidencing an intent to carry out such threat.  (Docket No. 49).  It argues that the text message Defendant sent to a friend prior to making the threat, his subsequent internet searches, his dishonest statements to

8

federal investigators about his access to guns, and his continued possession of a pistol, constitutes conduct evidencing an intent to carry out his threat. (*Id.*). In response, Defendant maintains that he was severely intoxicated at the time he made the threat; he did not take any steps to locate the victim or ascertain any further information about them; and he never referenced his firearms in his text message, threat, or internet searches. (Docket No. 56). The Probation Office took the position that the information contained in the PIR regarding Defendant's offense conduct does not clearly provide a direct connection between his "internet searches, text communications, etc." and his threat to the victim. (Docket No. 53).

Having considered the matter, the Court tentatively finds that the Government has met its burden to show by a preponderance of the evidence that Defendant engaged in an overt act sufficient to establish his intent to carry out the threat to the victim. To that end, the totality of the circumstances demonstrates that Defendant's actions prior to, during and after sending the threat show that it was more likely than not that he had the intent to carry out the threat.

At the outset, it is uncontested that Defendant held deep-seated antisemitic views, lived in the Pittsburgh area, had a small arsenal of weapons and ammunition, had access to a vehicle, and regularly traveled throughout the Greater Pittsburgh area including, at least, between Allegheny, Butler, and Westmoreland Counties. (PIR ¶¶ 22–32, 75, 88–91). He was with his former girlfriend at the apartment they previously shared in Elizabeth on May 20, 2025 and they went together to eat at a restaurant in Squirrel Hill on May 25, 2025.[2] (*Id.* ¶¶ 22–23, 75). He often

---

2       The Court notes that the restaurant in Squirrel Hill where law enforcement first contacted Defendant was a considerable distance from any of the locations he would have regularly occupied, such as his residence, his mother's house, and his place of employment. *See* Google Maps, https://www.google.com/maps (last visited May 6, 2026) (calculating a distance of approximately 16 miles from Elizabeth); *id.* (calculating a distance of approximately 34 miles from Harmony); *id.* (calculating a distance of approximately 22 miles from Miller's Motor Sports in Rostraver). The Court takes judicial notice of the approximate distance between these three locations and the restaurant. *See*

traveled throughout the area with his firearms, as it is undisputed that he drove his two rifles to Butler County on May 25, 2025 and delivered them to his mother, and then drove to the FBI field office on the Southside of Pittsburgh on May 30, 2025 with a semiautomatic 9mm firearm and ammunition in his vehicle.   (*Id.* ¶¶ 35–36).   He also admits that he was kicked out of his girlfriend's apartment on May 25 and then spent the next few days living in his vehicle until his arrest on May 30.   (Docket No. 56 at 7, 17, 22).   Hence, he had the capacity to carry out the threat he made to a local public official who frequently attended public events in the area, supported Israel, and was accessible enough that they maintained a personal Facebook account.

In addition, Defendant's other conduct around the time shows that he had the intent to carry out his threat.   To that end, he specifically searched Facebook for "Pittsburgh Jews," identified the victim as someone whom he believed was Jewish and/or supported Israel, and sent his threat as a direct message to their personal account – choosing an individual in the same area as his potential target as opposed to sending it to someone who lived and worked in another state or across the country.   (PIR ¶¶ 16–19, 32).   And this individual was a local public official, making their whereabouts on certain dates and times more readily ascertainable than that of a private citizen.   (Docket No. 57 at 3).   Moreover, he shielded his own identity by using a Facebook account with a pseudonym and, if the victim had replied, the Facebook Messenger app would have permitted him to call the victim and see additional information about them, including their active

---

*Untracht v. Fikri*, 454 F. Supp. 2d 289, 302 n.9 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir. 2007) ("A court can take judicial notice of distances."); *DeForte v. Borough of Worthington*, No. 2:13-CV-00356, 2023 WL 2726704, at *20 n.15 (W.D. Pa. Mar. 31, 2023) (same).   Notably, this restaurant was less than one block from the Jewish Community Center of Greater Pittsburgh, approximately two blocks from the Beth Shalom Synagogue and Early Learning Center and the Young Israel of Pittsburgh Synagogue, and approximately five blocks from the Tree of Life Synagogue.   *See* Google Maps, *infra*.   However innocuous Defendant's reason for visiting this particular restaurant that day might be, this plainly shows that the predominantly Jewish neighborhoods of Pittsburgh were not a prohibitive distance from Defendant.

status and if and when the victim had read messages.   (*Id.* ¶ 18).

Defendant also engaged in an overt act only 26 minutes prior to sending the threat which was substantially and directly connected to the offense in that he specifically texted his friend, "You ready to hunt down Jews for extinction?"   (*Id.* ¶ 25).   Defendant's use of the words "we" and "us" in the threat he sent less than half an hour later are revealing when viewed in the context of this earlier text message.   *See* PIR ¶ 18 ("*We're* coming for you . . . be afraid. Go back to Israel or better yet, exterminate yourself and save *us* the trouble. 109 countries for a reason. *We* will not stop until your kind is nonexistent[.]" (emphasis added)).   As the Government points out, Defendant's use of first-person plural personal pronouns in the Facebook message "reflect[s] his state of mind that he is not acting alone," and explicitly asking his friend if they are prepared to "hunt" the same group people whom he then threatened to render "nonexistent" just moments later is directly and substantially related to this disposition.   (Docket No. 49 at 3).   On top of this, the language used in the threat echoes this text message—i.e., "hunt down Jews for extinction" which is essentially interchangeable with "exterminate yourself and save us the trouble" and the declaration that they "will not stop until your kind is nonexistent."   *See United States v. Koch*, 783 F. App'x 218, 221 (3d Cir. 2019) (finding that "the level of detail in [Defendant's] letters" and "the similarity between the conduct threatened" and his prior murder conviction "were enough to support the Court's finding of intent" under § 2A6.1(b)(1)).

Defendant's communications to other individuals before and after transmitting the threat as contained in the indictment further support to conclusion that this text message was an overt act which demonstrated his intent to carry out the threat.   In the days preceding May 20, 2025, Defendant sent antisemitic text messages expressing support for Nazi Germany and Hitler, as well

as his general prejudice against the Jewish people. (PIR ¶ 24). Similarly, approximately one hour after he messaged the victim, he sent a string of texts to another friend which included a message condemning Israel and "everyone and everything involved in Middle East conflicts," and stating "They're (Jews) animals man." (*Id.* ¶ 27). Yet, unlike these text messages, this text message specifically inquired about his friend's readiness to take direct action, rather than expressing general antisemitic prejudice against the Jewish people. *See Green*, 25 F.3d at 211 (asking a friend to run the victim's license plate was sufficient overt act from which intent to carry out the threat could be inferred). In addition, Defendant sent this text in closer temporal proximity to the threat than any of the other foregoing messages. Hence, under the facts taken as a whole, drafting and sending this text message is a specific action which was substantially and directly related to the offense conduct.

Although Defendant maintains that he was "severely intoxicated at the time of his actions," the Court does not find enough support in the record to credit this assertion. Special Agent Patcher's affidavit of probable cause indicated that Defendant initially told the FBI agents during his interview on May 25, 2025 that he "must have been 'black-out drunk'" when he sent the threatening message and later reiterated that "he wanted to take responsibility for the message because he was a drunk." (Docket No. 5-1 ¶ 21). But, his girlfriend told the agents that she "spent the evening of May 20, 2025, at [her] residence with [Defendant] and did not observe him to be intoxicated." (*Id.* ¶ 22). Further, the PIR contains no indication that Defendant was intoxicated on the evening of May 20, 2025 and Defendant did not dispute any portion of the PIR or raise any objections thereto. *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact.").

12

In any event, the Court need not definitively resolve the question of whether Defendant was intoxicated during the relevant time, as it does not agree with Defendant that his purported alcohol consumption that night supports the notion that his conduct was "spontaneous and done without any intent to execute." (Docket No. 56 at 11). Rather, the undisputed facts demonstrate that Defendant had been exhibiting antisemitic bias in his text communications, online activity, and comments to his girlfriend long before he allegedly got "black-out drunk" on May 20, 2025 and sent the threat in this case. *See* PIR 32 (advising that Defendant made antisemitic comments to his girlfriend since the start of their relationship in 2023); *see also* Docket No. 56 at 7 ("With few friends to discuss his frustrations with, [Defendant's] emotions continued to grow over time.").

Turning to Defendant's post-offense conduct, the Third Circuit has also "upheld the application of an enhancement under Section 2A6.1(b)(1) where the defendant engaged in an overt act evidencing an intent to carry out a threat *after* it was communicated." *United States v. Hafner*, No. 23-3258, 2026 WL 560227, at *5 (3d Cir. Feb. 27, 2026) (emphasis added). At the outset, Defendant's continued failure to be wholly transparent with the agents about the whereabouts of his firearms supports an inference that he understood the relevancy of his access to firearms and his threatened conduct. Despite repeatedly telling the FBI agents otherwise, he clearly still had access to all three of his guns up until the day of his arrest. (PIR ¶¶ 22, 33, 35). His subsequent relinquishing of his two rifles the same day law enforcement first inquired about them indicates that Defendant knew the information he initially provided was deceitful. (*Id.*). And his persistent obfuscation indicates that he intended to maintain some level of access to his firearms without interference from law enforcement. *See United States v. Kirsh*, 54 F.3d 1062, 1073 (2d Cir. 1995) (upholding the application of Guideline § 2A6.1(b)(1) where the district court "found

that the [defendants] possessed weapons for the purpose of carrying out the threats made in the letters" and "rejected as not credible the claim that the guns were meant for a legitimate activity such as hunting.").

Notably, Defendant clearly had the opportunity to relinquish all three firearms on May 25, 2025, yet he chose to retain possession of his pistol.   The deliberate decision to keep all but one of his firearms after FBI agents inquired about his access to same during an interview *about* his threatening Facebook message is an action beyond merely transmitting an antisemitic threat to a stranger.  *See United States v. Carter*, 111 F.3d 509, 514 (7th Cir. 1997) ("The fact that Carter actually owned and carried firearms shows an easy ability to carry out his threatened violence, making his threats more than mere puffery."); *see also United States v. Brodie*, 824 F. App'x 117, 121 (3d Cir. 2020) (possessing multiple firearms and ammunition and threatening to commit an act of gun violence, *inter alia*, was sufficient evidence of intent to carry out a threat).   Because Defendant's initial contact with law enforcement was directly related to his threatening message, his continued retention of a firearm and willingness to travel across the Greater Pittsburgh area with it loaded, chambered, and easily accessible in his vehicle, amounts to overt conduct evidencing an intent to carry out his threat.   *See Hafner*, 2026 WL 560227, at *5.

Finally, Defendant had an iPad and iPhone in his vehicle when he arrived at the FBI field office under the guise of retrieving his confiscated cellphone on the morning of his arrest.   (PIR ¶ 36).   As the Government's motion to unseal this case indicates, Defendant was arrested by 10:17 a.m., meaning he must have arrived at the FBI filed office early that morning to retrieve his cellphone—at the latest, before 10:00 a.m.—despite having two other devices in his vehicle. (Docket No. 8).   His prompt arrival to retrieve an ostensibly unnecessary third device suggests an

14

eagerness to obtain his cellphone which, for all he knew, still had access to his "Casey Jones" Facebook account, the threat he sent to a local public official, and the potential ability to call the victim and access information about their activity on their personal Facebook account. (PIR ¶ 18). Considering that Defendant likely believed that he would be free to leave the FBI offices that morning, these facts further support an inference that he more likely than not had the intent to carry out his threats.

Under the facts of the case taken as a whole, the totality of Defendant's conduct sufficiently demonstrates that it was more likely than not that he had the intent to carry out the threat. *See Brodie*, 824 F. App'x at 122 (upholding the application of an enhancement under § 2A6.1(b)(1) where the district court identified several factors which collectively supported its applicability). Hence, the Government has established the applicability of the challenged enhancement by a preponderance of the evidence.

V.      CONCLUSION

For all of these reasons, the Court tentatively finds that the six-level enhancement under Sentencing Guideline § 2A6.1(b)(1) applies in the present case. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Date:           May 8, 2026
cc/ecf:         All counsel of record
                U.S. Probation Office

15